IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2011

## BRIAN ERIC MCGOWEN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-A-506      J. Randall Wyatt, Jr., Judge**

---

**No. M2010-01555-CCA-R3-PC - Filed May 23, 2011**

---

The petitioner, Brian Eric McGowen, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his convictions for first degree felony murder, especially aggravated robbery, and attempted especially aggravated robbery and resulting effective sentence of life plus forty years to be served at one hundred percent. The petitioner contends that he received the ineffective assistance of counsel. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Brian Eric McGowen.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

We glean the following relevant facts from this court's opinion in the petitioner's direct appeal: On February 18, 2001, the petitioner and his stepson's sixteen-year-old friend, Richard Wheeler, robbed and shot Joseph Barker and shot Barker's wife, Patricia, in downtown Nashville. State v. Brian Eric McGowen, No. M2004-00109-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 913, at **2-7 (Nashville, Aug. 18, 2005), perm. to appeal denied, (Tenn. 2005). According to the proof at trial, Wheeler pointed a pistol at Mr. Barker and demanded money. Id. at *3. Mr. Barker said he did not have any money but gave Wheeler an electronic beeper. Id. Mr. Barker struggled with Wheeler, and Wheeler shot the couple,

killing Mrs. Barker. Id. at **3-5. Soon after the shooting, the police captured Wheeler, and he implicated the petitioner. Id. at *6. Wheeler later pled guilty to felony murder and especially aggravated robbery. Id. at *7.

At the petitioner's trial, Wheeler testified for the State that on the day of the crimes, he walked downtown with the petitioner. He and the petitioner saw the Barkers leaving a restaurant, and the petitioner pointed to Mr. Barker and said, "'We're fixing to rob him.'" Id. at *9. At first, Wheeler refused to participate in the robbery. Id. However, Wheeler then confronted Mr. Barker and demanded money. Id. at *10. Charles Malone testified that he saw Wheeler and the petitioner walking together before the shooting and saw Wheeler approach the Barkers while the petitioner waited at the corner of a building. Id. at *6. Malone said that Wheeler and Mr. Barker began struggling over the gun and that the petitioner fled. Id. at **6-7. Kenny Warren testified that he witnessed the shooting and saw one man point a pistol at the Barkers while a second man stood a short distance away. Id. at *11. Warren said the second man ran away when the first man began firing the gun. Id. at *12.

Before trial, the State requested that the petitioner's stepson, James Zonneville, be declared an unavailable witness in order for Zonneville's preliminary hearing testimony to be introduced into evidence. Id. at *23. The trial court granted the State's motion. Id. at *26. Zonneville testified during the preliminary hearing that the petitioner returned home after the crimes, was nervous, and told Zonneville that he and Wheeler had "'walked up on' a couple." Id. at *23. The petitioner also told Zonneville that he left when Wheeler began shooting. Id.

The petitioner testified at trial that he and Wheeler walked into downtown Nashville; that Wheeler told him, "'Watch this shit'"; and that Wheeler ran across the street. Id. at **13-14. Wheeler pointed a pistol at the Barkers, and the petitioner left the scene. Id. at *14. The jury convicted the petitioner of the first degree felony murder of Mrs. Barker, the especially aggravated robbery of Mr. Barker for taking Mr. Barker's beeper, and the attempted especially aggravated robbery of Mr. Barker for trying to take Mr. Barker's money. Id. at *36. The trial court sentenced him to consecutive sentences of life, forty, and twenty years, respectively. Id. at *1-2. On appeal, this court ordered that the petitioner's conviction for attempted especially aggravated robbery be merged into his conviction for especially aggravated robbery but affirmed the judgments of the trial court in all other respects. Id. at *2.

After our supreme court denied the petitioner's application for permission to appeal, the petitioner filed a timely petition for post-conviction relief, alleging that he received the ineffective assistance of counsel. The post-conviction court appointed counsel, and counsel

filed an amended petition, arguing that trial counsel was ineffective because he (1) failed to advise the petitioner about the case adequately; (2) failed to advise the petitioner correctly as to the strength of the State's case, which caused the petitioner to reject the State's plea offer; (3) failed to request a change of venue; (4) failed to request a continuance so that Zonneville could be located for trial and failed to locate and interview witnesses; (5) failed to prepare the petitioner adequately for his trial testimony; (6) failed to prepare adequately for trial; and (7) failed to ensure that the petitioner's statement to police was redacted properly before the State played the statement for the jury.

At the evidentiary hearing, Anthony James Zonneville, the petitioner's stepson, testified for the petitioner that he had known the petitioner "[e]ver since I was a little kid." Zonneville was fourteen years old and living with the petitioner at the time of the crimes. Zonneville's brother and sister also lived with the petitioner. Zonneville said that a police officer and the district attorney told him what to say at the preliminary hearing or that he would never see his brothers and sisters again and would be charged with murder. He said that his mother was incarcerated at the time and that his brothers and sisters were "all I had." Zonneville said he, therefore, lied at the preliminary hearing by testifying that the petitioner "[a]dmitted doing everything." Zonneville said that if he had testified at trial, he would have said the following: Zonneville left home with a friend on the day of the crimes. When he returned home, the petitioner was gone. The petitioner came home and "started doing his drug." The petitioner never made any statements to Zonneville about the crimes. Zonneville testified that after the petitioner's preliminary hearing, he "went on the run from DCS custody." He explained that he "would stay on the run for two or three months and be back in custody and I'd run again and come back in custody again." He said that he was on juvenile probation at the time and stopped reporting to his probation officer but that he was still living in the same neighborhood with his family. To his knowledge, no one was looking for him while he was on the run from DCS.

On cross-examination, Zonneville testified that he was serving a seven-year sentence for robbery and had prior convictions for theft and burglary of a motor vehicle. He also had violated his probation previously. He said a person told him to testify at the preliminary hearing that the petitioner went downtown with Wheeler to rob and kill someone but that he did not remember the person's name. He acknowledged that if the police had shown up looking for him after the petitioner's preliminary hearing, he would have run.

Jim Todd testified for the State that he was assigned to prosecute the petitioner's case, was present at the petitioner's preliminary hearing, and spoke with Zonneville at the hearing. He did not tell Zonneville what to say and did not threaten Zonneville. He said that he "understood the difficulty that [Zonneville] would have had testifying against his father" and that he wanted "to lock [Zonneville's] testimony in as soon as I could." He said he did not

remember what he said to Zonneville specifically but would have explained to Zonneville the ramifications of lying under oath. Nothing linked Zonneville to the crimes, and Todd never told Zonneville that Zonneville would never see his family again. Zonneville was subpoenaed to testify at trial, but the State was unable to locate him. The trial court declared Zonneville unavailable, allowing the State to use his preliminary hearing testimony at trial.

On cross-examination, Todd testified that although he never heard a police officer threaten Zonneville, detectives could have met with Zonneville when Todd was not present. Zonneville had given a statement to police that made him an inculpatory witnesses. Todd confronted Zonneville with the statement and may have told him that he could be charged with perjury if he lied at the preliminary hearing. He said that Zonneville was reluctant to testify at the preliminary hearing and that "[n]obody could find him, not just our office" for trial. Wheeler pled guilty in exchange for a life sentence, and Todd did not think Wheeler testified against the petitioner at trial. Todd said that he was sure he discussed a plea offer with the petitioner's trial counsel but that "I don't know how close we ever got."

On redirect examination, Todd reviewed his notes and testified that the State offered to let the petitioner plead guilty to second degree murder in exchange for a thirty-five-year sentence to be served at one hundred percent. He did not recall whether he put a withdrawal date on the offer.

The petitioner testified that trial counsel was the second attorney appointed in his case, that his first attorney "had the case for years," and that trial counsel was appointed "just weeks before we went to trial." He said that counsel met with him "seems like twice" and that counsel went over discovery with him. He said that counsel "conned" him into thinking counsel had tried murder cases previously and that he later learned counsel had not tried any murder cases. He said counsel "felt pretty confident that I had a good chance at trial." He said that the State offered for him to plead guilty in exchange for a thirty-five-year sentence and that counsel did not have any feelings "one way or the other" as to whether he should accept the offer. The petitioner had never gone to trial before but had pled guilty to crimes. He said that the State usually made a couple of plea offers but that it made only one offer in this case. He said that he thought he had time for the State to make another offer but that "all of a sudden, all of the deals [were] off the table." He said that counsel did not tell him the State would not make another offer and that counsel "didn't want to pressure me either way, whether to take the deal or not take the deal."

The petitioner testified that he did not understand Wheeler was going to testify at trial and that he would have accepted the State's plea offer if he had known Wheeler was going to be a witness against him. He said counsel should have requested a change of venue because the petitioner had appeared in front of the trial court for three previous cases and

because this case "was all over the news." The petitioner told counsel that Zonneville could be found at Zonneville's mother's house and that he wanted Zonneville to testify at trial. The petitioner said counsel tried to prepare him for his testimony "a little bit," that "it's not something that we worked on a lot," and that he did not know anything about "opening the door." During his testimony, the trial court ruled that he opened the door to questioning about his prior convictions. Counsel did not advise him as to whether testifying was a good or bad idea, but he later learned it was a bad idea for a defendant to testify in a murder trial. He said counsel was overwhelmed, did not have time to prepare for trial, and should have filed a motion for a continuance until counsel was better prepared. Counsel also allowed the petitioner's statement to police to be played for the jury. Although the trial court had ordered that the statement be redacted, the jury heard the petitioner refer to one of the victims as "bitch." The statement had not been redacted properly, and counsel did not object. During Charles Malone's direct testimony, Malone could not identify the petitioner in court. However, during trial counsel's cross-examination, Malone identified the petitioner as a participant in the crimes.

On cross-examination, the petitioner acknowledged that he discussed the State's plea offer with counsel and that counsel did not pressure him to accept the offer. The petitioner said he thought the State would make another offer, but Jim Todd came into the courtroom on the day of trial and stated that "all the deals are off the table."

Trial counsel testified that he had been a lawyer for sixteen years and had practiced criminal defense exclusively. One month before the petitioner's trial was scheduled to begin, counsel was appointed to represent him. Within days, counsel filed a motion to continue. The trial was rescheduled, giving counsel four months to prepare. According to counsel's notes, he met with the petitioner for forty-eight minutes on February 6, 2003, for one hour on February 28, and for nine hours in May. Counsel acknowledged that he talked with the petitioner about the charges and penalties. He said that to his recollection, the State's plea offer "had already long since been given and been rejected" when he was appointed. Counsel said the petitioner's first attorney told counsel that "this was a defendant who wanted a trial, that settlement was over."

Counsel testified that he was "pretty sure" the trial court addressed during voir dire whether the potential jurors had been exposed to pretrial publicity and that he thought some potential jurors were dismissed for cause. Counsel prepared the petitioner to testify, and the trial court granted counsel's motion to prohibit the State from questioning the petitioner about his prior robbery convictions. Counsel said that he would have told the petitioner "we've got to keep the door closed" and that he told the petitioner to "only testify about what happened this day." Counsel said that he did not think he told the petitioner this was a good case for trial and that "I think my position on all of this was if you don't like the offer and

you think you're going to die in prison, you have a fighting chance." Counsel did not pressure the petitioner about the offer.

Counsel testified that Zonneville's preliminary hearing testimony was "fairly consistent" with the petitioner's story and that he did not think Zonneville was going to change the jury's mind. Counsel could not think of anything more he could have done to prepare for trial. He said that the petitioner was correct in that Malone did not identify the petitioner until counsel's cross-examination and that he "felt like an idiot that that happened." However, the petitioner had admitted to being at the scene of the crimes. Therefore, counsel did not consider Malone's identification of the petitioner to be material. He said Malone's identification of the petitioner on cross-examination "was just one of those things that happen."

On cross-examination, counsel testified that he had tried at least five murder cases before the petitioner's case. He said that spending only nine hours with the petitioner would have been "relatively low" but that the petitioner's first attorney worked on the case for a long time before counsel was appointed. Regarding the petitioner's testimony, trial counsel said that "we went through generally what he was going to say" and that he would have told the petitioner to "focus on that date, don't talk about things in general." Counsel said that he did not believe the petitioner opened the door to his prior convictions but that it was a "borderline issue" and that this court agreed with the trial court. Counsel did not remember discussing the plea offer with the petitioner, and the petitioner was adamant that he was innocent. Counsel said, "I'm not going to strong arm a guy who's insisting they're innocent and spending probably the rest of their life in prison." He said that he decided not to file a motion for change of venue because "you want a Davidson County Jury unless you absolutely have to not have a Davidson County Jury" and that the petitioner may have disagreed with his decision. He acknowledged that an extensive amount of pretrial publicity existed in the case. Counsel did not interview any witnesses, but the State provided Jencks material for Kenny Warren and Charles Malone. The State's theory was that the petitioner was criminally responsible for directing Wheeler, and the defense's theory was that Wheeler acted alone.

The post-conviction court noted that counsel said he met with the petitioner for nine hours prior to trial, went over discovery with him, and discussed the charges and possible penalties. The court specifically accredited counsel's testimony and found no merit to the petitioner's claim that counsel failed to advise the petitioner about the case adequately. As to whether counsel failed to advise the petitioner properly about the State's plea offer, the court noted that a decision to accept or reject an offer is to be made by a defendant, not his attorney. The court accredited counsel's testimony that the offer had been made and rejected prior to his representation of the petitioner and that, in any event, there was no way counsel

-6-

could have known the State would withdraw the offer immediately before trial. Regarding change of venue, the post-conviction court stated that the petitioner's having appeared before the trial court previously was not a valid basis for a change of venue. The post-conviction court concluded that the trial court addressed pretrial publicity about the case during voir dire and that counsel wanted a Davidson County jury. As for the petitioner's claim that counsel should have secured the attendance of Zonneville and failed to interview witnesses, the court concluded that no one could find Zonneville and that Zonneville's testimony was not crucial to the case in light of Wheeler's testimony against the petitioner. Regarding the petitioner's trial testimony, the court determined that counsel advised the petitioner about the "benefits and problems" with testifying, that counsel instructed the petitioner about how to testify, and that the petitioner inadvertently opened the door to his prior convictions. The court concluded that counsel "devoted significant time" to the petitioner's case during the four months prior to trial and that no merit existed for the petitioner's claim that counsel was inadequately prepared. Finally, as to the petitioner's claim that counsel failed to ensure that his statement was redacted properly before it was played for the jury, the court determined that counsel did not render deficient performance.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was

deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Regarding trial counsel's failure to advise the petitioner about the case adequately, the post-conviction court accredited trial counsel's testimony that he spent nine hours with the petitioner, going over discovery and discussing the petitioner's case. We note that counsel said he could not think of anything more he could have done to prepare for trial and that the petitioner has not explained what more counsel could have done. As for the petitioner's claim that counsel failed to advise him adequately about the State's plea offer, counsel testified that the petitioner already had rejected the offer when he was appointed to the case. According to the petitioner, on the morning of trial, he still had not accepted the offer and the prosecutor announced in the courtroom that any offers were "off the table." We fail to see how the petitioner can now claim that counsel was ineffective by failing to tell him that the State would not make another offer shortly before trial was scheduled to begin. As for counsel's failure to request a change of venue, the post-conviction court correctly noted that the petitioner's having appeared before the same trial court previously was not a proper basis for requesting a change of venue. In any event, counsel stated that he wanted a Davidson County jury, and "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief" as long as counsel's "'choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)). Nothing indicates counsel's tactical choice regarding venue was unreasonable. Therefore, the petitioner has failed to show that counsel rendered deficient performance.

Next, the petitioner contends that counsel failed to prepare him adequately for his

testimony, which resulted in his opening the door to his prior convictions. According to this court's opinion from the petitioner's direct appeal, after the petitioner testified on direct examination, the trial court found that his "emphatic assertion that he never considered robbery as a method for making money on the day of the shooting" opened the door to the State's asking him on cross-examination if he had ever been convicted of a robbery. McGowen, No. M2004-00109-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 913, at *54. However, counsel stated that he prepared the petitioner to testify and cautioned the petitioner about opening the door to his prior convictions. In light of counsel's testimony, which the post-conviction court obviously accredited, we cannot say that counsel rendered deficient performance.

The petitioner contends that counsel failed to prepare adequately for trial, conducted no independent investigation, and failed to interview witnesses. The post-conviction court determined that counsel was prepared, and the petitioner has failed to explain what more counsel should have done or what witnesses counsel should have interviewed. Finally, the petitioner claims that he received the ineffective assistance of counsel because trial counsel allowed the jury to hear that he referred to one of the victims as "bitch" and allowed Malone, who had been unable to identify him on direct examination, to identify him on cross-examination. However, even if counsel rendered deficient performance regarding those issues, the petitioner has filed to show prejudice. Therefore, we agree with the post-conviction court that the petitioner did not receive the ineffective assistance of counsel.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
NORMA McGEE OGLE, JUDGE